1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    MICHAEL WITKIN,                          No.  2:19-cv-0406 TLN KJN P

12              Plaintiff,

13         v.

14    MARIANA LOTERSZTAIN, et al.,             FINDINGS & RECOMMENDATIONS

15              Defendants.

16

17    I.  Introduction

18          Plaintiff is a former state prisoner, proceeding pro se and in forma pauperis, with a civil

19    rights action under 42 U.S.C. § 1983.  The motion for summary judgment filed by defendants

20    Lotersztain, Scott, Largoza, Kuersten, and Gates is before the court.  As set forth below, it is

21    recommended that defendants' motion be granted in part and denied in part.

22    II.  Background

23          On November 19, 2021, defendants Lotersztain, Scott, Largoza, Kuersten, and Gates filed

24    a motion for summary judgment, along with their declarations, plaintiff's medical records and

25    portions of plaintiff's deposition transcript.[1]  (ECF No. 53.)  Plaintiff's redacted medical records

26    were filed on January 11, 2022.  (ECF No. 65.)

27    _____

28    [1]  On March 14, 2023, the undersigned recommended that defendant Lin's motion for summary
      judgment be granted.  (ECF No. 93.)

                                              1

Following extensions of time, on December 11, 2022, plaintiff filed an opposition to moving defendants' motion (ECF No. 89), and included plaintiff's declaration, plaintiff's health care grievance, interrogatory responses and documents obtained through discovery, and copies of plaintiff's medical records.

Moving defendants filed their reply on December 21, 2022.  (ECF No. 91.)

III.  Allegations of the Verified Complaint

Plaintiff alleges that Dr. Lotersztain, Dr. Scott, Dr. Largoza, Dr. Kuersten, and S. Gates were deliberately indifferent to plaintiff's serious medical needs by intentionally refusing to treat or properly treat plaintiff's broken finger, resulting in the permanent disfigurement of his finger, as well as permanent loss of range of motion.  Plaintiff also alleges that defendant Lotersztain refused to treat plaintiff's injuries in retaliation for plaintiff's pending civil rights litigation against her.  (ECF No. 1 at 7.)  Further, plaintiff raises state law claims against defendants Dr. Lotersztain, Dr. Scott, Dr. Largoza, Dr. Kuersten, and S. Gates, alleging professional negligence (medical malpractice), refusal to summon medical care in violation of Section 845.6, and negligent infliction of emotional distress.

IV.  Legal Standards for Summary Judgment[2]

Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil Procedure 56 is met.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).[3]

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file,

---

[2]  Plaintiff argues that this court should apply California summary judgment standards under California Code of Civil Procedure section 437(c) and relies on various state law cases.  (ECF No. 89, passim.)  However, as argued by defendants, the motion for summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure.

[3]  Federal Rule of Civil Procedure 56 was revised and rearranged effective December 10, 2010.  However, as stated in the Advisory Committee Notes to the 2010 Amendments to Rule 56, "[t]he standard for granting summary judgment remains unchanged."

> together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c).) "Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.)*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp.*, 477 U.S. at 325); *see also* Fed. R. Civ. P. 56 Advisory Committee Notes to 2010 Amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact"). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists. *See* Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *see Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

By notice issued November 19, 2022 (ECF No. 53), plaintiff was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

V.  Underlying Facts[4] ("UDF")

1.  At all times relevant herein, plaintiff was a state prisoner.

---

[4]  For purposes of summary judgment, the undersigned finds these facts are undisputed.  Where plaintiff failed to properly address a defendant's assertion of fact as required, this Court considers the fact undisputed.  See Fed. R. Civ. P. 56(e)(2).

2.  On January 5, 2017, plaintiff filled out a request for healthcare services form, indicating he injured his right hand.  On February 2, 2017, plaintiff's right hand x-ray imaging indicated no fracture or dislocation, and there were mild degenerative changes, with the impression stating no acute osseous abnormality.

3.  Plaintiff had various medical appointments in 2017 that related to recurrent lower back and knee pain.  During some of those visits, plaintiff was noted as having a heavy workout routine, and on October 30, 2017, plaintiff was seen by Dr. Mo, his primary care physician, and Dr. Mo indicated plaintiff's lower back pain exacerbations were likely due to plaintiff's heavy workouts.  Further, on December 6, 2017, plaintiff was seen by Dr. Mo, his primary care physician, and he communicated that he was playing several games of basketball three times a week previously, along with 4000 pushups, 1000 pull-ups, various core and strengthening exercises, and 50-100 one-legged squats per week.  Plaintiff admitted he is somewhat addicted to exercise, and that he doesn't feel right when he doesn't work out.  Plaintiff was advised of the concept of relative rest and was told to resume light workouts at that time.

4.  On December 23, 2017, plaintiff was seen by nonparty RN Usmonov at 13:43 PST (1:43 p.m.), complaining of an injury that occurred while plaintiff was playing football involving plaintiff's fourth finger on his right hand.  (ECF No. 65 at 12-14.)  Plaintiff indicated he was in pain, and the injury occurred at 1:00 p.m.[5]  (Id. at 13.)  Plaintiff was sent to TTA at 13:43 PST (1:43 p.m.).  (ECF No. 65 at 14.)

5.  That same day, at 16:30 PST (4:30 p.m.), Dr. Lotersztain treated plaintiff's injury to his fourth finger on his right hand.  (ECF No. 65 at 17-18.)  Dr. Lotersztain documented the following:

> Right hand: 4th finger with swelling at the PIP [proximal interphalangeal] joint, tender to pressure on the PIP joint, all other fingers WNL [within normal limits], can make a fist but full flexion

[5]  RN Usmonov recorded plaintiff's pain level as 5.  Plaintiff claims he reported the pain as "excruciating" and "severe," citing CDCR 117, 118, and his declaration ¶¶ 5, 9.)  However, none of these documents reflect his pain complaint to RN Usmonov on December 23, 2017.  (ECF No. 89-3 at 68 (CDCR 117) is a health care request form dated January 3, 2018; ECF No. 89-3 at 67 (CDCR 118) is a health care request form dated January 2, 2018); (¶ 5 of plaintiff's declaration refers generally to plaintiff's "pain complaints;" ¶ 9 involves plaintiff's December 26, 2017 encounter with defendant Scott and x-rays of the fracture (ECF No. 89-2 at 2).)

of 4th PIP joint is limited due to pain.  No obvious PIP deformity besides swelling.  DIP [distal interphalangeal] joint with minimal pain.  Bruising seen on medial side of PIP joint.

(ECF No. 65 at 18.)  Dr. Lotersztain set forth the following assessment/plan:

Injury of fourth finger of right hand[.]  ¶  No obvious deformity besides swelling but PIP dislocation cannot be ruled out.  X-ray not available until 12/26/17:  ordered for that date.  Splint/buddy tape right 4th finger until X-ray done.  ¶  Ice packs daily for 5 days, Ibuprofen for pain.  ¶  Educated to not play sports to avoid further injuries until condition improves.  ¶  Even when the PIP may not be dislocated, gave education for patients from UpToDate about finger dislocations.  He verbalized understanding:  "I understand, we don't know yet if it is dislocated, we'll wait for the X-ray."

(ECF No. 65 at 18.)[6]  At 16:00 PST (4:00 p.m.), plaintiff was provided his first dose of 400 mg ibuprofen, and a prescription to keep on his person.  (Id.)  He was given a lay-in until December 28, 2017, meaning plaintiff did not have to go to work.  (Id.)  A nurse gave plaintiff an ice pack.  (ECF No. 89-3 at 65.)

Defendant Dr. Lotersztain declares that the use of a buddy splint/tape was appropriate for plaintiff based on her physical examination of plaintiff's injury and the information known at that time and he would be further evaluated once diagnostic imaging confirmed the nature and extent of the finger injury, including whether plaintiff's finger was dislocated, sprained, or fractured.  (ECF No. 53-8 at 2.)  Dr. Lotersztain does not address the application of the splint in her declaration.  (Id., passim.)  On the other hand, plaintiff declares that Dr. Lotersztain did not immobilize the finger or apply the splint to plaintiff's finger, but rather "threw what appeared to be two standard popsicle sticks and a roll of some kind of tape at plaintiff and told him to head back to his housing unit."  (ECF No. 1 at 3 ¶ 13.)  The two also dispute what the doctor said to

_____

[6]  In their statement, defendants claim that Dr. Lotersztain ordered the x-ray of plaintiff's finger "under the emergent category," (ECF No. 53-2 at 3 ¶ 7) but the medical record does not reflect such order on December 23, 2017 (ECF No. 65 at 18).  Dr. Lotersztain declares the diagnostic imaging was ordered to occur as soon as possible.  (ECF No. 53-8 at 2.)  Plaintiff claims that Dr. Lotersztain denied plaintiff's request for an x-ray, citing plaintiff's health care grievance.  (ECF No. 89-1 at 3, citing ECF No. 89-3 at 8.)  However, the grievance provides only plaintiff's claim that Dr. Lotersztain denied the x-ray, which is contrary to her medical record from December 23, 2017.

1    plaintiff at that time.[7]

2          6.  Plaintiff was not provided an x-ray on December 23, 2017, but medical records

3    confirm Dr. Lotersztain ordered the x-ray on December 23, 2017.  (ECF No. 65 at 19.)  On

4    December 26, 2017, the x-ray order was "started" at 8:00 PST, and Dr. Lotersztain noted

5    "emergent," to "rule out 4th finger PIP dislocation."  (Id.)

6          7.  On December 26, 2017, plaintiff's finger was x-rayed.  (ECF No. 65 at 3, 20.)  The

7    impression was noted as comminuted fourth proximal phalanx fracture.  (ECF No. 65 at 3.)  The

8    x-ray also revealed mild degenerative changes.  (Id.)  Following the x-ray, Dr. Lotersztain

9    ordered a follow-up appointment for review of the x-ray report and refer to TTA if needed.  (ECF

10   No. 65 at 20.)

11         8.  On December 26, 2017, plaintiff met with Dr. Scott who reviewed plaintiff's x-ray

12   results and noted Dr. Largoza entered urgent referral for ortho.  (ECF No. 65 at 22.)  Dr. Scott

13   assessed fracture of finger of right hand, plaster splint applied, urgent ortho referral entered;

14   plaintiff was directed to ice intermittently until swelling resolved.  (ECF No. 65 at 22.)  Plaintiff

15   was provided an ice card to have access to ice.  (ECF No. 65 at 23.)  That same day, Dr. Largoza

16   ordered an urgent referral to hand surgeon to evaluate and treat plaintiff's finger, noting plaintiff's

17   fracture and requesting hand surgeon ASAP.  (ECF No. 65 at 25.)

18         9.  On December 26, 2017, Dr. Kuersten approved the referral.  (ECF No. 65 at 26.)  The

19   handwritten notes on the form indicate plaintiff was seen by Dr. Scott at TTA, and Dr. Largoza

20   marked "ASAP," and the date of consultation with Dr. Lins [sic] was noted to be January 9, 2018,

21   at 3:15 p.m.  (ECF No. 65 at 26.)

22         10.  On January 2, 2018, plaintiff submitted a request for healthcare services, indicating he

23   "experienced delay in surgical referral, hopefully due to holidays, needs immediate medical

24   attention for excruciating right finger pain (x-ray showed shattered bone)."  (ECF No. 65 at 27.)

25   Plaintiff's request was reviewed by Nurse Kromann, with an undecipherable handwritten

26   comment included in response to the request.  (Id.)  Plaintiff submitted another request for

27   ───────────────────

28   [7]  Plaintiff claims that Dr. Lotersztain "admitted to plaintiff that his finger was broken," (ECF No. 89-1 at 2), but the medical record does not reflect such claim.

7

medical services on January 3, 2018, indicating the problem as "there is an unconstitutional delay in providing me with the urgent medical care for broken right ring finger result is the unnecessary infliction of severe pain and possible permanent disability." (ECF No. 65 at 28.)  Nurse Kromann reviewed the request again and indicated the same undecipherable handwritten comment in response to the request.  (Id.)

11.  On January 4, 2018, Nurse Kromann treated plaintiff.  (ECF No. 65 at 29-34.) Kromann recorded plaintiff communicated he "put in the sick call slip because he needed the Motrin renewed and wanted to know when am I am going to see the orthopedic doctor, because I need something done, my team is playing and I can't just sit on the side lines." (ECF No. 65 at 29.)  Nurse Kromann noted that the orthopedic consultation was pending and that plaintiff's splint was in place.  (Id.)  Plaintiff had 4th finger deformity and mild edema, with no numbness or tingling sensation, and that plaintiff stated pain is 2 to 6 out of 10.  (ECF No. 65 at 30-31.) Plaintiff was told that Dr. Rohrer will renew the Motrin prescription, an orthopedic follow-up was already scheduled, and plaintiff was encouraged not to play sports for now.  (Id. at 32.)  On January 4, 2018, Dr. Rohrer prescribed plaintiff Ibuprofen 400 mg three times a day.  (Id. at 41.)

12.  On January 9, 2018, plaintiff met with Dr. Lin, an orthopedic specialist at Neugenesis Plastic Surgery, for the first and only time.  (ECF No. 65 at 35.)  Dr. Lin took off plaintiff's plaster splint, examined plaintiff's finger and reviewed plaintiff's x-rays.  Dr. Lin's impression was a right ring finger proximal phalanx/PIP joint intra-articular fracture, with slight displacement.  Dr. Lin noted no rotational deformity, meaning the "finger appeared straight and did not appear to cross any other finger when plaintiff would attempt to close his hand." (ECF Nos. 65 at 36; 55-2 at 75.)  The fracture was 17 days old at the time Dr. Lin saw plaintiff.

Dr. Lin explained to plaintiff the risks, benefits, and complications of different options, and answered questions.  Dr. Lin charted that "Mr. Witkin decided on fracture immobilization with a splint."  (Id.)  Dr. Lin applied an Oval-8 splint.  Plaintiff was advised to stay in the splint for another week and after that he could start gradual range of motion exercises.  He was instructed not to expose the fracture site to excessive stress for two months.  Dr. Lin charted that he explained the nature of fractured bone maturation which would reach the maximum strength of

approximately 85% to 95% pre-fracture strength after a year.  (Id.)  The discharge plan was

"FOLLOW-UP AS NEEDED."  (Id. at 36.)  Dr. Lin's medical record makes no reference to pain.

(ECF No. 65 at 35-36.)

13.  Plaintiff returned to California State Prison-Solano on the same day as his

appointment with Dr. Lin.  (ECF No. 65 at 37.)  Plaintiff was seen by RN Bacareza,

who noted the oval splint was intact, that there was mild swelling in his finger, and plaintiff was

notified to seek immediate medical attention if his condition changed or worsened.  (ECF No. 65

at 40-43.)  At intake, RN Bacareza recorded "No actual or suspected pain;" at the time plaintiff

was prescribed Ibuprofen 400 mg three times a day.  (ECF No. 65 at 35, 41.)[8]

14.  On January 12, 2018, plaintiff had a follow-up appointment with Dr. Bentley.

(ECF No. 65 at 44.)  Dr. Bentley charted that plaintiff's fourth finger was in a splint

and that plaintiff reported that "he has decided to let it heal on its own and he is okay."  (Id.)  Dr.

Bentley noted multiple edema, moderate to mild, and no numbness or tingling sensation.  (Id.)

15.  Plaintiff had a further visit with RN Kaur on January 17, 2018, complaining of

chronic back pain and needed to see doctor about his finger.  (ECF No. 65 at 47-48.)  Per

plaintiff, he also had abdominal pain from working out his ab muscles twice in the prior week.

(ECF No. 65 at 47.)  In assessing plaintiff's musculoskeletal joints, RN Kaur noted that plaintiff's

fourth finger joint was enlarged and had limited motion but was active.  (ECF No. 65 at 50.)  At

the time, plaintiff had two active medications for pain, ibuprofen (400 mg) and naproxen (220

mg).  (ECF No. 65 at 48.)  Plaintiff was scheduled for a follow-up with his primary care

physician, Dr. Mo, for his chronic right-hand finger and back pain.  (See ECF No. 65 at 51.)

16.  On January 21, 2018, plaintiff completed a healthcare services request form

complaining of severe pain from back spasm and claiming he does not believe his finger is

healing properly.  (ECF No. 65 at 55.)  On January 24, 2018, plaintiff was seen by RN Kromann,

who assessed plaintiff's right ring finger pain as "not too bad," noted a slight finger deformity,

---

[8]  Plaintiff claims his pain was excruciating and severe but cites his health care request forms
from January 2 and 3, 2018, before he was prescribed Ibuprofen.  (ECF No. 89-1 at 7, citing ECF
No. 89-3 at 67-68.)

9

edema, but plaintiff denied numbness or tingling.  (ECF No. 65 at 58-59.)  Plaintiff was once again encouraged to take it easy and told not to get involved in playing sports for now.  (Id. at 60.)

17.  On January 30, 2018, plaintiff was seen by Dr. Mo, who indicated plaintiff is no longer wearing his splint on his finger and that he is just doing range of motion exercises.  (ECF No. 65 at 64.)  In the assessment/plan, Dr. Mo charted that in between episodes, plaintiff is clearly active playing basketball and football; under finger fracture, Dr. Mo charted "Doing well," return in 60 days with x-ray scheduled for February 6, 2018.  (ECF No. 65 at 64, 67.)

18.  On February 6, 2018, the x-ray results indicated there was little evidence of healing of the comminuted fracture of the fourth proximal phalanx, and that it was indicated as a "remote boxer fracture deformity."  (ECF No. 65 at 3.)  After reviewing the x-ray results, Dr. Mo ordered further finger x-rays to occur on March 7, 2018, along with subsequent follow-up appointment with plaintiff to discuss the x-ray findings.  (ECF No. 65 at 19, 67, 69.)

19.  On February 23, 2018, plaintiff filled out a healthcare services request related to back spasms and back pain, and he was evaluated by nurse Kaur on February 27, 2018.  (ECF No. 65 at 70, 71.)  RN Kaur's notes indicate that plaintiff communicated that his back spasms started the other day while he was playing basketball.  (ECF No. 65 at 71.)  On March 7, 2018, plaintiff's fourth right finger was x-rayed again, and the following findings noted:

> A comminuted fracture of the fourth proximal phalanx is redemonstrated.  Mild interval healing change is noted.  The fracture is incompletely healed.  Alignment is stable.  No new injury.  IMPRESSION:  Incompletely healed fourth finger fracture.

(ECF No. 65 at 77.)

20.  On March 15, 2018, plaintiff was seen again by Dr. Mo, who indicated plaintiff told him he had resumed his regular exercise schedule, including doing push-ups, pull-ups and playing up to eight basketball games a day.  (ECF No. 65 at 78, 82.)  As Assessment/Plan, Dr. Mo charted:

> Discussed the importance of modulating his activity.  Patient tends to exercise extremely vigorously to the point where he is susceptible to injury. . . . ¶ Advised him to stretch and ease into his exercise next

1   time.  Finger fracture x-ray shows healing.  We'll follow-up with him
in April for his next checkup.

2

3   (ECF No. 65 at 79.)

4      21.  On April 26, 2018, Dr. Mo again saw plaintiff, who indicated he has no new major

5   complaints.  (ECF No. 65 at 80, 85.)  Dr. Mo charted that plaintiff communicated he was playing

6   in basketball leagues in addition to upper body work and that he was pulling a weighted workup

7   sled with a harness.  (Id.)  No further treatment was noted other than follow up for chronic care

8   issues.  (ECF No. 65 at 81.)

9      22.  On October 23, 2018, plaintiff was again seen by Dr. Mo.  (ECF No. 65 at 83.)  Dr.

10   Mo noted no edema at plaintiff's extremities and there was no indication of any further treatment

11   for his right fourth finger.  (ECF No. 65 at 83-84.)  Plaintiff stated he was still working out,

12   playing football, and basketball.  (Id.)

13      23.  On November 22, 2019, plaintiff's fourth right index finger was again x-rayed.  (ECF

14   No. 65 at 86-87.)  The diagnostic radiology report stated:

15          Phalanx fracture has healed.  No acute osseous abnormality is
identified.  Minimal degenerative changes are present.

16          IMPRESSION:  1.  HEALED FOURTH PROXIMAL PHALANX
FRACTURE.

17

18   (ECF No. 65 at 87.)

19      State Law Claims

20      On May 7, 2018, the Department of General Services received plaintiff's government

21   claim, assigned no. 18004824, concerning his injury sustained on December 23, 2017, and

22   claiming he suffered permanent disfigurement and loss of range of motion/function when

23   defendants refused to summon immediate medical care for a broken bone.  (ECF No. 53-3 at 15,

24   17-26.)  Plaintiff identified "CHCHS, Lotersztain, Largoza, Kuersten, and Does 1-10" as to

25   whom the claim is filed.  (Id.)  On June 11, 2018, the Department of General Services rejected

26   plaintiff's claim.  (ECF No. 53-3 at 27-28.)

27   VI.  Exhaustion of Administrative Remedies

28      On February 3, 2018, plaintiff submitted a health care grievance claiming officials at CSP-

1  Solano failed to timely get him to an orthopedic surgeon who told plaintiff that because of the 17-

2  day delay, plaintiff's finger bone fused/knitted, reducing the change of successful surgery, and

3  causing plaintiff loss of range of motion, disfigurement, unnecessary pain and suffering,

4  depression, and emotional distress." (ECF No. 89-3 at 7, 9.)  Plaintiff claimed Dr. Lotersztain

5  diagnosed dislocation and demanded to pop the finger, but plaintiff refused; plaintiff asked for an

6  x-ray, which Dr. Lotersztain denied.  (ECF No. 89-3 at 9.)  If not for the involved staff members'

7  deliberate indifference, plaintiff claimed his finger could have been surgically repaired.  (Id.)

8        Plaintiff was interviewed by RN Baumert on March 26, 2018, concerning the grievance.

9  On March 27, 2018, defendant Dr. Largoza found no intervention was required, writing:

> on January 9, 2018, [plaintiff was] seen by a specialist for [his]
> finger.  [Plaintiff was] given multiple options of treatment and
> [plaintiff] chose the option of "immobilization with a splint."  On
> March 15, 2018, [plaintiff was] examined by Dr. Mo.  During that
> encounter, it is noted that x-rays of [plaintiff's] finger displayed
> "mild interval healing."  RN Baumert explained to [plaintiff] that
> [he] should wear [his] finger splint to protect [his] finger as much as
> possible.  RN Baumert noted that [plaintiff] did not wear the splint
> to the interview.  Monetary compensation is outside the jurisdiction
> of the health care grievance process.

16  (ECF No. 89-3 at 11-12.)

17        In his April 4, 2018 request for appeal, plaintiff wrote that he was "'given' the option of

18  surgery, but the orthopedic surgeon didn't consider it a viable option due to the delay."  (Id.)  The

19  delay reduced the "possibility of a successful surgery to less than or equal to 'immobilization with

20  a splint.'"  (ECF No. 89-3 at 8.)  Plaintiff objected that the use of the term "option" was

21  inaccurate because the delay deprived plaintiff of a successful surgical option, and that broken

22  bones require "immediate medical care" under California Government Code § 845.6, and medical

23  staff was deliberately indifferent to plaintiff's need for such immediate medical care.  (ECF No.

24  89-3 at 8.)  Plaintiff argued that it was reasonable to infer that the physicians knew the delay

25  would essentially eliminate the surgical option, thus enabling CCHCS to avoid paying for it.  (Id.)

26        On July 5, 2018, defendant S. Gates, Chief, Health Care Correspondence and Appeals

27  Branch, found no intervention was required, exhausting plaintiff's administrative remedies.  (ECF

28  No. 89-3 at 6.)

VII.  Eighth Amendment Claims

Legal Standards

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)).  This requires plaintiff to show (1) "a 'serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) that "the defendant's response to the need was deliberately indifferent." Id. (quoting McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992) (citation and internal quotations marks omitted), overruled on other grounds by WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc)).

By establishing the existence of a serious medical need, a prisoner satisfies the objective requirement for proving an Eighth Amendment violation.  Farmer v. Brennan, 511 U.S. 825, 834 (1994).  Deliberate indifference is established only where the defendant subjectively "knows of and disregards an excessive risk to inmate health and safety." Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) (citation and internal quotation marks omitted); Farmer, 511 U.S. at 837. Deliberate indifference can be established "by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." Jett, 439 F.3d at 1096 (citation omitted).  To be found liable under the Eighth Amendment, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837.  "If a [prison official] should have been aware of the risk but was not then the [official] has not violated the Eighth Amendment, no matter how severe the risk." Gibson v. Cty of Washoe, 290 F.3d 1175, 1188 (9th Cir. 2002), overruled on other grounds by Castro v. County of Los Angeles, 833 F.3d 1060, 1076 (9th Cir. 2016).

"Typically, a difference of opinion between a physician and the prisoner -- or between medical professionals -- concerning what medical care is appropriate does not amount to deliberate indifference." Edmo v. Corizon, Inc., 935 F.3d 757, 786 (9th Cir. 2019) (citations,

quotations and brackets omitted).  "But that is true only if the dueling opinions are medically

acceptable under the circumstances."  Edmo, 935 F.3d at 786 (citation omitted).  To determine

whether the treatment was medically acceptable, courts must consider "the record, the judgments

of prison medical officials, and the views of prudent professionals in the field. . . ."  Id.

"Accepted standards of care and practice within the medical community are highly relevant in

determining what care is medically acceptable and unacceptable."  Id.

Discussion

Here, the parties do not dispute that plaintiff's fractured finger presented a serious medical

need.  Rather, this case turns on whether each defendant was deliberately indifferent to plaintiff's

serious medical needs.

1.   Dr. Lotersztain

The undersigned finds that there are material disputes of fact precluding summary

judgment on behalf of Dr. Lotersztain.  First, it is unclear why her x-ray order is dated 12/23/2017

at 15:52 PST but was not "started" until 12/26/2017 at 08:00 PST.  (ECF No. 65 at 19.)  Further,

the 12/26/2017 order is marked "emergent."  (Id.)  It is unclear why plaintiff's need for an x-ray

was not emergent on December 23, 2017, but became emergent on December 26, 2017.  Given

the impending holiday, it is unclear why plaintiff could not have earlier received an x-ray since he

presented at clinic on December 23, 2017, at 1:43 p.m.  (ECF No. 65 at 14.)  Dr. Lotersztain does

not explain why an x-ray was not available until December 26, 2017, or why there is a

discrepancy in the time frames of her x-ray order.

Second, in her declaration, Dr. Lotersztain does not address or rebut plaintiff's claim that

she opted to treat another inmate exhibiting cold symptoms rather than address plaintiff's need for

an x-ray, or that she ignored plaintiff's requests for assistance for two hours.  Dr. Lotersztain does

not refute plaintiff's claim that there were only two patients in the TTA on December 23, 2017, at

the time plaintiff presented for treatment.

Third, Dr. Lotersztain does not address whether she immobilized and splinted plaintiff's

finger.  Plaintiff declares she did not; indeed, he declares she threw the tape and popsicle sticks at

plaintiff and ordered him to return to his housing.  The medical records from the other physicians

1  demonstrate the importance of immobilization and splinting.  In addition, plaintiff provided Dr.

2  Scott's interrogatory response that "[i]mmobilization can improve physical function, slows

3  disease progression, and diminish pain."  (ECF No. 89-3 at 25.)  On this record a jury could find

4  that Dr. Lotersztain's alleged refusal to splint and immobilize plaintiff's finger constituted a

5  culpable state of mind.

6        Fourth, the expert declaration of Dr. Burgar does not address the issue of delay.  (ECF No.

7  55-2.)  Specifically, Dr. Burgar does not address the initial delay of x-raying plaintiff's finger or

8  the alleged initial failure to immobilize and splint plaintiff's finger.  In addition, Dr. Burgar does

9  not address whether Dr. Lotersztain's medical treatment met the standard of care; rather, Dr.

10  Burgar's focus was the treatment by Dr. Lin, who was not involved in the alleged delay.

11        Fourth, in her interrogatory response, with the caveat that it was her lay opinion and not

12  provided as an expert, Dr. Lotersztain stated that:

13
14       treatment for a right ring finger PIP joint communited [sic] intra
     articular fracture will depend on the severity of the fracture, and case
     by case factors, including, but not limited to, *the time that has lapsed*

15       *since the fracture occurred*; what prior treatment was used and
     whether such prior treatment was beneficial or harmful; the nature
     and extent of other injuries which may impact treatment options; the

16       likely or unlikely causes of the fracture; and any other information
     that can be obtained through a physical exam, diagnostic imaging, or

17       the patient's documented medical history.

18  (ECF No. 89-3 at 15 (emphasis added); see also ECF No. 89-3 at 28 (Dr. Scott's response)

19  (same).)  Thus, Dr. Lotersztain was aware that timing of treatment was a factor.  Dr. Kuersten

20  responded that "[i]n some instances, a 'long delay' between the time of the injury and the start of

21  treatment for a broken finger could lead to poor healing, decreased range of motion or decreased

22  grip strength.  The treatment of each injury is unique, and the treatment that should be done is

23  evaluated on a case by case basis."  (ECF No. 89-3 at 40.)  The fact that Dr. Lotersztain noted that

24  time lapse may impact treatment options and ordered "emergent" on December 26, 2017,

25  supports plaintiff's assertion that he should have received an x-ray soon after his injury, not three

26  days later.

27        Finally, while defendants contend that plaintiff failed to provide evidence of causation or

28  harm caused by the delay, the record confirms that plaintiff continued to suffer pain, edema, and

finger deformity while he waited to see Dr. Lin (UDF 10, 11).  Plaintiff contends he has sustained loss of range of motion to his finger which is visibly deformed.  Plaintiff is not required to establish that Dr. Lotersztain's conduct caused substantial or permanent harm for purposes of his Eighth Amendment medical deliberate indifference claim.  See McGuckin, 974 F.2d at 1060 ("[A] finding that the defendant's activities resulted in 'substantial' harm to the prisoner is not necessary[.]") (citation omitted); Sharpe v. Cryer, 2021 WL 3911306, at *13 (E.D. Cal. Sept. 1, 2021), report and recommendation adopted, 2021 WL 5177451 (E.D. Cal. Nov. 8, 2021) ("[A]t this stage of the proceedings, even without evidence that plaintiff's [condition] worsened, it is sufficient that Plaintiff suffered 'an unnecessary continuation of his condition' to raise a genuine issue of material fact on this issue.") (quoting McGuckin, 974 F.2d at 1062).

A prison health care provider's refusal to provide treatment, or delay of treatment, for an unacceptable or non-medical reason can constitute deliberate indifference.  See Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996) (on summary judgment, defendant physicians were not entitled to qualified immunity when plaintiff alleged that they denied him a kidney transplant because of personal animosity); see also Egberto v. Nevada Dep't of Corr., 678 F. App'x 500, 503-04 (9th Cir. 2017) (prison officials interference with prisoner's treatment for non-medical reasons, such as personal animus, could constitute deliberate indifference); Lopez v. Smith, 203 F.3d 1122, 1132 (9th Cir. 2000) (to show deliberate indifference, "[a] prisoner need not prove that he was completely denied medical care"); Wakefield v. Thompson, 177 F.3d 1160, 1165 (9th Cir. 1999) (prison official's failure to provide inmate with prescribed medication because official was "too busy" could show deliberate indifference).

Taking plaintiff's evidence as true for purposes of this summary judgment motion, a reasonable factfinder could find that defendant Dr. Lotersztain ignored plaintiff's requests for assistance and delayed treating plaintiff such that he was unable to obtain an x-ray until December 26, 2017, and defendant refused to splint and immobilize plaintiff's injured finger, based on plaintiff's ongoing litigation against Dr. Lotersztain rather than for any acceptable medical reason, and that plaintiff suffered harm as a result.

////

1    For all these reasons, the undersigned finds material disputes of fact preclude summary

2    judgment as to Dr. Lotersztain on plaintiff's Eighth Amendment claim.[9]

3        2. Delay in Specialist Referral

4    On the other hand, the undersigned does not find a material dispute of fact exists as to the

5    purported delay in referring plaintiff to the specialist by Dr. Scott, Dr. Largoza or Dr. Kuersten.

6    Unlike for Dr. Lotersztain, plaintiff alleges no facts demonstrating that any of these defendants

7    acted with a culpable state of mind.  Plaintiff adduced no evidence demonstrating that such

8    doctors were aware of plaintiff's injury prior to December 26, 2017.  Moreover, each doctor

9    marked the referral urgent, some adding "as soon as possible" on the very day each became aware

10   that plaintiff's finger was fractured.  It is undisputed that plaintiff was seen by Dr. Lin on January

11   9, 2018, only fourteen days after Drs. Scott, Largoza and Kuersten made the referral.

12   As argued by plaintiff,

13        According to the CDCR policy, emergent consultations or
          procedures shall be provided "immediately," high priority
14        consultations shall be provided within 14 days, and "routine"
          consultations or procedures shall be provided within 90 calendar
15        days.

16   (ECF No. 89 at 9) (quoting Holt v. Finander, 2019 U.S. Dist. LEXIS 120950, at *54-57 (C.D.

17   Cal. June 10, 2019).[10]  The record confirms that plaintiff was seen by orthopedic specialist Dr.

18   Lin fourteen days after Dr. Scott, Dr. Largoza and Dr. Kuersten ordered the referral on December

19   26, 2017.

20   ////

---

21   [9]  That said, the undersigned does not credit plaintiff's claim that Dr. Lotersztain did not deny that
22   she commented on plaintiff's prior litigation against her at the time of the December 23, 2017
     medical encounter, citing her interrogatory responses 2 through 7.  (ECF No. 89 at 6.)  Plaintiff
23   did not provide the questions posed in interrogatories 2, 4 through 7, and interrogatory 3 does not
     address the issue of what she said during the encounter.  (ECF No. 89-3 at 15-17.)  Moreover, in
24   her declaration, Dr. Lotersztain declares that due to the passage of time she does not recall the
     specific statements made during the treatment, but she disputes that she made the statements
25   attributed to her in the complaint or that she made any reference to plaintiff's prior lawsuit against
26   her, declaring "[i]t is not in my nature to comment on such matters."  (ECF No. 53-8 at 2.)

27   [10]  In Holt, the prisoner raised Eighth Amendment claims based on the failure of prison doctors to
     properly treat Holt's wrist that was fractured on May 11, 2013.
28

Plaintiff contends that the orthopedic referral should have been ordered on an "emergent" basis.  Plaintiff declares that Dr. Largoza "knew that an emergent referral was necessary under the standard of care, in order for successful surgical intervention on plaintiff's broken bone." (ECF No. 1 at 4.)  He also declares that Dr. Kuersten knew that an urgent referral would result in a two-week delay, was not consistent with the standard of care, and would probably cause permanent disfigurement. (Id.)  However, plaintiff provides no competent medical evidence to support his view that his injury warranted an emergent referral as opposed to an urgent referral.  Plaintiff's reliance on the CDCR Health Care Department Operations Manual provided to him during discovery (ECF No. 89-3 at 48-51) is unavailing because it is unclear whether such policies were in effect in 2017.[11]  The Physician Request for Services form used in plaintiff's care provided three timeframes:  emergent, urgent, and routine; the policy provided by plaintiff identified the following time frames: emergent, high or medium priority, and routine.  (ECF Nos. 65 at 26, 89-3 at 49.)  As argued by defendants, such choices in timeframes are medical judgments.  See Castenada v. Department of Corrections and Rehabilitation, 212 Cal.App.4th 1051, 1073 (2nd Dist. Ct. App. 2013); followed by Scalia v. County of Kern, 308 F. Supp. 3d 1064, 1086 (2018).

Further, Dr. Largoza and Dr. Kuersten declare that they are not responsible for directly scheduling a specialist appointment for a patient.  Plaintiff presented no evidence demonstrating that plaintiff was not provided with the first available appointment with Dr. Lin or that either Dr. Largoza or Dr. Kuersten were involved in delaying plaintiff's appointment with Dr. Lin.  In addition, plaintiff provided no competent evidence that Dr. Lin had an earlier appointment available, even if any referring doctor had selected an "emergent" referral.

For all the above reasons, Dr. Scott, Dr. Largoza and Dr. Kuersten are entitled to summary judgment on plaintiff's claim that they delayed plaintiff's specialty referral.

3.  Dr. Scott's Treatment

Plaintiff saw Dr. Scott on one occasion; Dr. Scott noted plaintiff's "comminuted fracture," applied a plaster splint and entered an urgent referral for plaintiff to consult an orthopedic

---

[11]  Defendants objected to plaintiff's reliance on such undated health care policies.  (ECF No. 91-2.)  Defendants' objection is sustained.

specialist.  Plaintiff contends that the standard of care required that plaintiff's fracture be immobilized, yet Dr. Scott applied a plaster splint that protected plaintiff's entire hand, wrist and forearm from impact, but did not immobilize the fracture at all.

As a layperson, plaintiff is not qualified to offer an opinion as to whether the plaster splint was appropriate or adequately immobilized his finger.  See Fed. Rule of Evidence 701.  Rather, an expert witness is required to offer an opinion on medical treatment.  See Fed. Rule of Evid. 702.  Plaintiff must adduce competent medical evidence demonstrating that defendant Dr. Scott's application of the splint was medically unacceptable under the circumstances.  See Edmo, 935 F.3d at 786

Plaintiff offers no such evidence.  The undersigned is persuaded that plaintiff's claim as to the application of the plaster cast demonstrates only a difference in opinion as to the proper treatment plaintiff's injured finger required.  Plaintiff fails to demonstrate, with competent medical evidence, that Dr. Scott's chosen course of treatment was medically unacceptable under the circumstances, or that Dr. Scott chose such treatment "in conscious disregard of an excessive risk to plaintiff's health."  Jackson, 90 F.3d at 332.  Accordingly, defendant Dr. Scott is entitled to summary judgment on this claim.

#### 4.  Defendants Involved in Reviewing Grievances

Both defendants S. Gates and Dr. Largoza reviewed plaintiff's healthcare appeal No. SOL HC 18000409 concerning the medical treatment of his broken finger.  (ECF No. 89-3 at 4-5, 11-12.)  In the complaint, plaintiff claimed that in reviewing the appeal, Dr. Largoza had the authority and opportunity to provide appropriate care to plaintiff, but Largoza refused to intervene.  (ECF No. 1 at 5 ¶ 19.)  Plaintiff claimed that at the time Gates reviewed plaintiff's appeal, Gates had the authority and opportunity to provide plaintiff with minimally adequate care but refused to do so.  (Id. at ¶ 20.)

District courts are divided on whether a medically trained supervisor who learns about alleged unconstitutional behavior from a prisoner's grievance and fails to intervene is personally involved in the constitutional violation.  Nicholson v. Finander, 2014 WL 1407828, *7 (C.D. Cal. April 11, 2014).  Some district courts have reasoned that no constitutional claim of any sort may

1   be based upon the administrative appeals process.  Id. (cases cited therein).  Other cases have held

2   that a grievance appeal reviewer who fails to remedy a denial of adequate medical care personally

3   participates in the alleged deprivation.  Id. (cases cited therein).

4       Administrative or supervisory defendants who were involved in reviewing claims in an

5   administrative grievance process may be liable for the constitutional violations complained of in

6   those grievances, depending upon (1) the type and timing of problem complained of, and (2) the

7   role of the defendant in the process.  For example, an appeals coordinator cannot cause or

8   contribute to a completed constitutional violation, which occurred in the past and which is not

9   remediable by any action the reviewer might take.  See, e.g., George v. Smith, 507 F.3d 605, 609-

10  10 (7th Cir. 2007) ("A guard who stands and watches while another guard beats a prisoner

11  violates the Constitution; a guard who rejects an administrative complaint about a completed act

12  of misconduct does not.").  A defendant whose only role in a completed constitutional violation

13  involved the denial of a grievance "cannot be liable under § 1983."  Shehee v. Luttrell, 199 F.3d

14  295, 300 (6th Cir. 1999).

15      If, however, the administrative or supervisory defendant "knew of an ongoing

16  constitutional violation and . . . had the authority and opportunity to prevent the ongoing

17  violation," yet failed to act to remedy the violation, then the defendant may be held liable under

18  § 1983.  Herrera v. Hall, 2010 WL 2791586 at *4 (E.D. Cal. July 14, 2010) (unpublished) (citing

19  Taylor, 880 F.2d at 1045), report and recommendation adopted, 2010 WL 3430412 (E.D. Cal.

20  Aug. 30, 2010).  Where claims are asserted against persons who supervise the provision of prison

21  medical care, the question at summary judgment is not whether the supervisor was "directly

22  involved" in the plaintiff's treatment.  Gonzalez v. Ahmed, 67 F. Supp. 3d 1145, 1156 (N.D. Cal.

23  2014).  Instead, the question is whether the plaintiff has provided evidence from which a jury

24  could find that the supervisor's "knowing failure to address" the treating provider's deficient care

25  interfered with the plaintiff's medical treatment.  Id.

26      Here, both appeal responses took place months after plaintiff was seen by Dr. Lin on

27  January 9, 2018:  Dr. Largoza issued the second level response on March 27, 2018, and S. Gates

28  on July 3, 2018.  (Id.)  Because their involvement took place after the orthopedic consult was

1    ordered and took place, the issue regarding the alleged initial delay in referring plaintiff to Dr. Lin

2    could not be corrected as the result of their involvement in the grievance process.  Indeed,

3    plaintiff contends that the delay deprived plaintiff of a successful surgical option.  (ECF No. 89-3

4    at 8.)    Thus, there is no material dispute of fact as to whether their involvement in the appeals

5    process contributed to such delay, or failed to remedy the medical issue, and plaintiff's Eighth

6    Amendment claims as to defendants Gates and Largoza are moot.

7            In his opposition, plaintiff attempts to hold both Largoza and Gates responsible for an

8    alleged failure to order follow-up with Dr. Lin because both defendants Largoza and Gates were

9    reviewing plaintiff's health care appeal at the time plaintiff allegedly needed the follow-up with

10   Dr. Lin.  (ECF No. 89 at 9-10; 11-12.)  Critically, however, plaintiff points to no specific request

11   in health care appeal HC 18000409 that indicates plaintiff was seeking a follow-up appointment

12   with Dr. Lin, and the undersigned found none.  Rather, as described above, plaintiff solely

13   complained about the delay in receiving the initial consult with Dr. Lin which plaintiff alleged

14   caused the loss of range of motion, disfigurement, and unnecessary pain and suffering.  (ECF No.

15   89-3 at 7-9.)  "While prison administrators can be liable for deliberate indifference when they

16   knowingly fail to respond to an inmate's requests for help, this theory of liability is viable only if

17   the administrator is reviewing a present need for medical care and, in ignoring the need, acts in

18   deliberate indifference to that need."  Galik v. Nangalama, 2012 U.S. Dist. LEXIS 14927, *3-4

19   (E.D. Cal. Feb. 6, 2012) (internal quotations omitted) (quoting Jett, 439 F.3d at 1098).

20           Further, Dr. Lin's discharge plan states follow-up "as needed;" plaintiff fails to identify

21   what sort of follow-up plaintiff believed was needed.  Plaintiff points to no health care requests in

22   which he sought further consult with Dr. Lin, and the medical records provided do not reflect

23   such request.  Defendants cannot be deliberately indifferent based on not addressing a complaint

24   not raised by plaintiff.

25           Nevertheless, it is undisputed that plaintiff received follow-up care from his primary care

26   physician who ordered repeat x-rays (UDF 18, 19), and monitored plaintiff's finger (UDF 17, 18,

27   20-22), until October 23, 2018 (UDF 22), when Dr. Mo noted no edema and no further treatment

28   was required, which was confirmed by the November 22, 2019 x-ray showing the fracture had

healed (UDF 23).  Again, plaintiff fails to identify any additional follow-up that was required.

On this record, the undersigned cannot find that either Dr. Largoza or defendant Gates were deliberately indifferent to plaintiff's serious medical needs based on their role in addressing plaintiff's health care appeal No. SOL HC 18000409.

VIII.   First Amendment Claim

Initially, the undersigned observes that defendants are correct that plaintiff claimed defendant Dr. Lotersztain retaliated against plaintiff on December 17, 2017 (ECF No. 1 at 7), but Dr. Lotersztain did not treat plaintiff on December 17, 2017.  However, the allegations in plaintiff's complaint demonstrate that Dr. Lotersztain treated plaintiff on December 23, 2017, and plaintiff incorporated by reference his paragraphs 1 through 32, suggesting that the December 17 reference on page 7 was a typographical error.  Liberally construed, plaintiff's complaint makes clear that he alleges Dr. Lotersztain retaliated against plaintiff while he was being treated by her on December 23, 2017.  Plaintiff alleges that Dr. Lotersztain delayed treating and failed to treat plaintiff in retaliation for plaintiff's prior litigation, based on plaintiff's claim that Dr. Lotersztain made certain statements about his pending civil rights litigation against her, which she denies.

Legal Standards

"Prisoners have a First Amendment right to file grievances against prison officials and to be free from retaliation for doing so."  Watison v. Carter, 668 F.3d 1108, 1114 (9th Cir. 2012) (citing Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009)).  A viable retaliation claim in the prison context has five elements:  "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."  Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005).  The provision of adequate medical care to inmates to maintain their health is a legitimate correctional goal.

Nevertheless, First Amendment retaliation is not established simply by showing adverse activity by a defendant after protected speech; rather, the plaintiff must show a nexus between the two.  See Huskey v. City of San Jose, 204 F.3d 893, 899 (9th Cir. 2000) (retaliation claim cannot

rest on the "logical fallacy of post hoc, ergo propter hoc, literally, 'after this, therefore because of this.'").  The plaintiff must allege specific facts demonstrating that the plaintiff's protected conduct was "the 'substantial' or 'motivating' factor behind the defendant's conduct."  Brodheim, 584 F.3d at 1271 (quoting Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir. 1989)).  Thus, plaintiff must "'put forth evidence of retaliatory motive, that, taken in the light most favorable to him, presents a genuine issue of material fact as to [defendant's] intent'" in taking the adverse action.  Brodheim, 584 F.3d at 1271 (quoting Bruce v. Ylst, 351 F.3d 1283, 1289 (9th Cir. 2003).)

In addition, the Ninth Circuit has found that preserving institutional order, discipline and security are legitimate penological goals which, if they provide the motivation for an official act taken, will defeat a claim of retaliation.  Barnett v. Centoni, 31 F.3d 813, 816 (9th Cir.1994); Rizzo v. Dawson, 778 F.2d 527, 532 (9th Cir. 1985) ("Challenges to restrictions of First Amendment rights must be analyzed in terms of the legitimate policies and goals of the correctional institution in the preservation of internal order and discipline, maintenance of institutional security, and rehabilitation of prisoners.").  The burden is thus on plaintiff to allege and demonstrate that legitimate correctional purposes did not motivate the actions by prison officials about which he complains.  See Pratt v. Rowland, 65 F.3d 802, 808 (9th Cir. 1995) ("[Plaintiff] must show that there were no legitimate correctional purposes motivating the actions he complains of.").

Discussion

Here, due to the passage of time, Dr. Lotersztain does not recall her specific statements, but disputes the statements attributed to her by plaintiff in his complaint and disputes that she made any reference to plaintiff's prior lawsuit against her during the treatment on December 23, 2017.  She denies intentionally or knowingly seeking to delay plaintiff's treatment and did not seek to harm plaintiff.  But Dr. Lotersztain does not specifically address or rebut plaintiff's claim that there were only two patients in the clinic on December 23, 2017, the other patient complaining of common cold symptoms, and that Dr. Lotersztain ignored plaintiff's pain complaints for two hours before she finally treated him about 4:15 p.m. after she allegedly

23

1  referenced plaintiff's lawsuit against her.  Plaintiff's allegations, taken as true, raise an inference

2  that Dr. Lotersztain delayed treating plaintiff based on his litigation against her.

3        Plaintiff also declares that Dr. Lotersztain stated "since you like to file lawsuits so much

4  you can figure this out yourself," and then "threw what appeared to be two standard popsicle

5  sticks and a roll of some kind of tape at plaintiff and told him to return to his housing unit."  (ECF

6  No. 1 at 3.)  Although Dr. Lotersztain denies making such statement, she presented no evidence

7  that she properly immobilized and splinted plaintiff's injured finger.  Indeed, although she

8  declares such splinting was proper, her declaration does not state that she immobilized and

9  splinted plaintiff's finger.  (ECF No. 53-8 at 1-2.)  She provided no evidence that she ordered a

10  nurse to apply the splint or that someone else applied the splint; the medical records reflect the

11  nurse only provided an ice pack.  (ECF No. 65 at 19.)  Defendants argue that "common sense

12  dictates it would not be very difficult for anybody to apply a splint/buddy tape or "popsicle sticks

13  and tapes" to your finger" (ECF No. 53-1 at 21), but Dr. Lotersztain does not address the ease in

14  which such splint could be applied, particularly by a patient suffering from a broken finger.

15  Defendants also contend that if plaintiff were unable to apply the splint himself, he could have

16  made a healthcare request or walked into a medical facility for assistance in applying the

17  splint/tape.  (ECF No. 53-1 at 21.)  But such expectation defies logic given Dr. Lotersztain

18  ordered the splint and plaintiff was already receiving medical care from Dr. Lotersztain for the

19  injured finger.  The competent medical evidence on record demonstrates that it was important to

20  immobilize plaintiff's injured finger, particularly while awaiting an x-ray.  If the jury credits

21  plaintiff's evidence, a reasonable factfinder could find that Dr. Lotersztain's failure to immobilize

22  plaintiff's injured finger and apply the splint was in retaliation for plaintiff's litigation.  At

23  bottom, there is a material dispute of fact as to whether Dr. Lotersztain's alleged refusal to

24  immobilize plaintiff's finger and apply the splint was done in retaliation for plaintiff's protected

25  litigation activity.

26        For the above reasons, defendant Dr. Lotersztain is not entitled to summary judgment on

27  plaintiff's First Amendment claims.

28  ////

1   IX.  State Law Claims

2          Defendants contend that plaintiff's state law claims are barred because plaintiff failed to

3   file this action within six months after his government claim was denied.  (ECF No. 53-1 at 27.)

4   Rather, plaintiff filed this action on March 6, 2019, which was 268 days after the denial letter was

5   mailed.  (Id.)  Defendants argue that compliance is mandatory, and the six-month deadline cannot

6   be extended by any provision outside of the Government Claims Act.  (Id.)  Defendants argue that

7   in order for the instant lawsuit to be timely, plaintiff must have filed his complaint by January 11,

8   2019.  (ECF No. 53-1 at 29.)  Defendants also argue that plaintiff's state law claims fail on the

9   merits.

10          In opposition, plaintiff argues that defendants failed to exclude the time during which

11   plaintiff was exhausting his administrative remedies in connection with the instant claims, and did

12   not provide plaintiff's administrative appeal; therefore, plaintiff contends defendants failed to

13   establish a prima facie case for summary judgment.  (ECF No. 89 at 13) (citing see Bagdasaryan

14   v. City of L.A., 2020 WL 2770193, at *11, 2020 U.S. Dist. LEXIS 96021, at *32 (C.D. Cal. Feb.

15   4, 2020).)  Plaintiff raises no other arguments as to the six-month statute of limitations.  Rather,

16   plaintiff contends that defendants failed to provide a declaration from an expert attesting that each

17   defendant's treatment comported with the community standard of care, and therefore the burden

18   did not shift to plaintiff to provide evidence on the merits of his state law claims.  (ECF No. 89 at

19   13.)  Finally, plaintiff argues that it is undisputed that defendants knew plaintiff needed

20   immediate medical care but only provided such care after a two-week delay, and defendants

21   solely rely on the disputed assertion that "plaintiff chose non-surgical treatment options."  (ECF

22   No. 89 at 14.)  For all these reasons, plaintiff contends defendants are not entitled to summary

23   judgment on plaintiff's state law claims.

24          In reply, defendants concede that in some circumstances, courts have extended the filing

25   deadline during the exhaustion of administrative remedies.  (ECF No. 91 at 7.)  However, even if

26   plaintiff is granted an extension during the exhaustion period, defendants contend his claim is

27   barred because this action was not filed within six months after plaintiff's last administrative

28   appeal was denied.  Further, defendants note that plaintiff provided no other plausible reason

1   plaintiff could not have filed the instant complaint within the sixth month period.

2        Standards

3        The California Government Claims Act ("Act") requires that a party seeking to recover

4   money damages from a public entity or its employees submit a claim to the entity before filing

5   suit in court, generally no later than six months after the cause of action accrues.[12]  Cal. Gov't

6   Code §§ 905, 911.2, 945, 950.2.  Timely claim presentation is not merely a procedural

7   requirement of the Act but is an element of a plaintiff's cause of action.  Shirk v. Vista Unified

8   Sch. Dist., 42 Cal. 4th 201, 209 (2007).  Thus, when a plaintiff asserts a claim subject to the Act,

9   plaintiff must affirmatively allege compliance with the claim presentation procedure, or

10  circumstances excusing such compliance, in the complaint.  Id.  The requirement that a plaintiff

11  asserting claims subject to the Act must affirmatively allege compliance with the claims filing

12  requirement applies in federal court as well.  Karim-Panahi v. Los Angeles Police Dep't, 839 F.2d

13  621, 627 (9th Cir. 1988) (citation omitted).

14       A cause of action against a public employee for injury resulting from an act or omission in

15  the scope of employment is barred if an action against the employing public entity would have

16  been barred because of the plaintiff's failure to present a written claim or failure to commence the

17  action within the time specified in Government Code section 945.6.  Cal. Gov. Code § 950.2.

18       Once rejected, the suit must be commenced within six months "after the date such notice

19  is personally delivered or deposited in the mail."  Cal. Gov. Code § 945.6, subd. (a)(1).  "The

20  plain meaning of section 945.6, subdivision (a)(1), is that the statute of limitations therein begins

21  to run when the written rejection notice is deposited in the mail to the claimant, or is personally

22  delivered, but not when it is delivered by the postal employee after having been deposited in the

23  mail pursuant to section 913."  Edgington v. County of San Diego, 118 Cal. App.3d 39, 46, 173

24  Cal. Rptr. 225 (1981).  Compliance with the claims statutes is mandatory.  Farrell v. County of

25  Placer, 23 Cal.2d 624, 630, 145 P.2d 570 (1944).  The six-month statute of limitations cannot be

26

27  _____

    [12]  The Act was formerly known as the California Tort Claims Act.  City of Stockton v. Superior
28  Court, 42 Cal.4th 730, 741-42 (Cal. 2007) (adopting the practice of using Government Claims
    Act rather than California Tort Claims Act).

extended by any provision outside of the Act.  <u>Martell v. Antelope Valley Hosp. Medical Center</u>, 67 Cal. App.4th 978, 982 (1998).  Even substantial compliance with this requirement does not excuse the late filing of the lawsuit raising the government claim.  <u>Hunter v. Los Angeles County</u>, 262 Cal. App.2d 820, 822 (1968) (the substantial compliance doctrine applies to defects in a claim filed with a public entity, but not defects in a complaint filed in court).

<u>Discussion</u>

It is undisputed that plaintiff timely filed his tort claim with the Department of General Services, and that the tort claim was rejected on June 11, 2018.  Thus, plaintiff's lawsuit based on such allegations should have been filed on or before December 11, 2018, within six months after the tort claim was rejected.  Under the mailbox rule,[13] plaintiff filed this action on February 24, 2019.  (ECF No. 1 at 10.)  Because this action was not filed within the six-month period, plaintiff's state law claims are barred.

Even assuming, without deciding, that plaintiff was entitled to tolling during the administrative grievance process, the instant complaint was not filed within six months after the headquarters response issued on July 5, 2018.  Because the six-month period expired on Saturday, January 5, 2019, plaintiff would have had to file the instant complaint on or before Monday, January 7, 2019, for the complaint to be timely.  But plaintiff did not file the instant complaint until February 24, 2019, over a month and a half too late.

Therefore, plaintiff's state law claims are time-barred.

X.  <u>Qualified Immunity</u>

<u>Legal Standard</u>

In <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), the Supreme Court set forth a two-pronged test to determine whether qualified immunity exists.  First, the court asks:  "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  <u>Id.</u> at 201.  If "a violation could be made out on a favorable view of the

---

[13] "[T]he <u>Houston</u> mailbox rule applies to § 1983 complaints filed by pro se prisoners."  <u>Douglas v. Noelle</u>, 567 F.3d 1103, 1109 (9th Cir. 2009), citing <u>Houston v. Lack</u>, 487 U.S. 266, 275-76 (1988).

1  parties' submissions, the next, sequential step is to ask whether the right was clearly established."

2  Id.  To be "clearly established," "[t]he contours of the right must be sufficiently clear that a

3  reasonable official would understand that what he is doing violates that right."  Id. at 202 (internal

4  quotation marks and citation omitted).  Accordingly, for the purposes of the second prong, the

5  dispositive inquiry "is whether it would be clear to a reasonable officer that his conduct was

6  unlawful in the situation he confronted."  Id.  Courts have the discretion to decide which prong to

7  address first, considering the circumstances of each case.  See Pearson v. Callahan, 555 U.S. 223,

8  236 (2009).

9      Defendants claim they are entitled to qualified immunity because the right to a specific

10  course of treatment was not clearly established, and defendants acted reasonably under the

11  circumstances.  Defendants contend plaintiff obtained appropriate treatment for his injured finger

12  and was provided an order for an orthopedic referral on the same day the x-ray confirmed the

13  extent of his injuries.  (ECF No. 53-1 at 35.)

14      For the following reasons, the undersigned finds that defendant Dr. Lotersztain is not

15  entitled to qualified immunity.  Taking the facts in the light most favorable to plaintiff, defendant

16  Dr. Lotersztain delayed plaintiff's treatment, depriving him of an ability to obtain a timely x-ray,

17  and refused to immobilize and splint plaintiff's injured finger allegedly in retaliation for

18  plaintiff's litigation against her, in violation of the First and Eighth Amendments.  The

19  undersigned also finds that it would be clear to a reasonable officer that Dr. Lotersztain's alleged

20  conduct was unlawful.  Accordingly, the undersigned finds that defendant Dr. Lotersztain is not

21  entitled to qualified immunity.

22      Because the undersigned did not find the remaining defendants violated plaintiff's

23  constitutional rights, no evaluation of qualified immunity is required as to the remaining

24  defendants.

25  ////

26  ////

27  ////

28  ////

28

XI.  Conclusion

Accordingly, IT IS HEREBY RECOMMENDED that the moving defendants' motion for summary judgment (ECF No. 53) be granted in part and denied in part, as follows:

1.  Defendant Dr. Lotersztain be denied summary judgment on plaintiff's Eighth Amendment and First Amendment retaliation claims;

2.  Defendants Scott, Largoza, Kuersten, and Gates be granted summary judgment on plaintiff's Eighth Amendment claims;

3.  Defendants Lotersztain, Scott, Largoza, Kuersten, and Gates be granted summary judgment on plaintiff's state law claims.

4.  Defendant Lotersztain's request for qualified immunity be denied without prejudice.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  March 30, 2023

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

/witk0406.msj.kjn

29